**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| GREG KING, | ) | CASE NO. 1:24-CV-02220 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES E. FLEMING |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF ROCKY RIVER, *et al.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | **DENYING MOTION FOR** |
| Defendants. | ) | **PRELIMINARY INJUNCTION** |

Before the Court is Plaintiff Greg King's ("King"), Motion for Preliminary Injunction, which he filed on July 28, 2025. (ECF No. 16). King seeks an order enjoining Defendant City of Rocky River ("City") and Defendant Chief of Police George Lichman ("Chief Lichman") (collectively, "Defendants") from moving forward with efforts to terminate King's employment, including a pre-termination *Loudermill* hearing scheduled for July 31, 2025.[1] Defendants opposed King's motion on July 29, 2025. (ECF No. 17). The Court held an evidentiary hearing on King's motion on July 30, 2025, at 8:00 AM. (ECF No. 19, Tr. of Prelim. Inj. Hr'g)[2]. The parties each presented witness testimony and evidence, and King's motion is now ripe for adjudication. For the following reasons, King's motion is **DENIED**.

## I.     FACTUAL BACKGROUND

King has been employed as a police officer in the City since April 2002. (*Id.* at PageID #884). In addition to serving the City as a patrol officer ("PO"), King is also one of three elected union directors of the Ohio Patrolmen's Benevolent Association; the other two directors were Officer Kolenc and Detective Hill. (*Id.* at PageID #885; 901).

---

[1] The City had set the *Loudermill* hearing for July 31, 2025 at 10:30 AM. (ECF No. 16-6, PageID #468). Prior to the hearing on King's motion, the City agreed to move the hearing to August 7, 2025, to give the Court additional time to prepare this Order.

[2] The parties must order the transcript to obtain a copy.

Chief Lichman has been employed by the City since March 1998.  (*Id.* at PageID #963).

He was promoted to interim chief in September 2020 and appointed chief in November 2020.  (*Id.*

at PageID #962–63).  Chief Lichman and King have worked together for 22 or 23 years.  (*Id.* at

PageID #963).

### A.  Officer Discontent, the Anonymous Memo, and the Vote of No-Confidence

King took a promotional exam in an effort to become sergeant.  (*Id.* at PageID #900).  He

ranked second, behind then-PO Troha.  (*Id.*).  He filed a grievance, accusing now-Sergeant Troha

of cheating on the exam and lying about it.  (ECF No. 16-3, May 30, 2025 Investigative Report,

PageID #429).  Chief Lichman determined that Sergeant Troha did not cheat on or lie about the

exam, and she was promoted.  (*Id.* at PageID #652).  King later unsuccessfully lobbied Chief

Lichman to create a new sergeant position and assign him to the detective bureau.  (*Id.* at PageID

#327).

King testified that, at some point prior to 2023, he and other officers developed various

concerns and complaints about Chief Lichman.  (ECF No. 19, PageID #809).  These included lack

of hiring practices in conjunction with planned retirements and the lack of individuals applying to

be a Rocky River police officer; a lack of personal first-aid kits; that many patrol cars were out of

service; that Chief Lichman was "lazy"; and others refused to follow the chain of command and

use official lines of communications as opposed to secret meetings and/or gossip.  (*Id.* at PageID

#890–899).

King also testified that some of Chief Lichman's actions bothered the officers.  Chief

Lichman ran a book-review account on Twitter[3] called, "The 30 Year Itch," which does not contain

his last name or his affiliation with the Rocky River Police Department ("RRPD").  (*Id.* at PageID

---

[3] Chief Lichman reference to "Twitter" concerns the social medial platform now known as "X."  *See* https://x.com.

#973).  Chief Lichman tweeted, "Interviewing candidates for entry level patrol officer.  We're in trouble.  Wow . . . aimless, unmotivated kids."  (*Id.* at PageID #904; ECF No. 16-1, Pl. Ex. 3, PageID #226) (ellipses in original).  According to King, this impacted morale.  (*Id.* at PageID #904).  This, along with Chief Lichman's habitual failures to respond to officer emails also "gave the appearance that the administration didn't support the [POs]."  (*Id.* at PageID #905).

Chief Lichman testified that this and the other tweets referenced in the Anonymous Memo were from 2012 or 2013 (seven to eight years before he became chief).  (*Id.* at PageID #974). When he made the tweet about interviewing potential officers, "someone made a copy of this on paper and stuffed it under the mayor's door at the time, and that tweet was deleted a day or two later because that was reported."  (*Id.* at PageID #974).

Another issue concerned Chief Lichman's Instagram account, where Chief Lichman posted a photo of a golf course; he took the photo through the window of his hotel room.  (*Id.* at PageID #906; 977; ECF No. 16-1, PageID #229).  In addition to the golf course, the lower half of Chief Lichman's nude body is visible in the window's reflection.  (ECF No. 19, PageID #906).  King testified that this photo bothered the RRPD officers because they felt it was hypocritical based on the discipline and termination of other officers for similar conduct.  (*Id.* at PageID #907).  At the hearing, King testified that the photo was from 2019, but denied saving the photo for several years prior to its inclusion in the Anonymous Memo.  (*Id.* at PageID #949).

Next, King and other officers objected to Chief Lichman's (then, Lieutenant Lichman) participation at a Black Lives Matter protest.  (*Id.* at PageID #907–08; 909).  King testified that officers working the demonstration took photos of Lichman, the former Chief of Police, and the Mayor of Rocky River kneeling at the protest.  (*Id.* at PageID #908; ECF No. 16-1, PageID #230). According to King, he and the other officers "felt like it was an unnecessary act of submission

3

when you are already showing supporting of their safety.  We didn't have to make such an overt political statement kneeling like that."  (ECF No. 19, PageID #908).  King and the officers also thought that they should have been consulted before then-Lieutenant Lichman, the former chief, and the mayor participated in the protest.  (*Id.* at PageID #910).  King testified at the hearing that he saved a photo of Chief Lichman's participation in the protest for several years, but not for any particular reason.  (*Id.* at PageID #951).

As a result of these concerns, King drafted an unsigned document ("Anonymous Memo") in his role as a union representative around January or February 2023.  (*Id.* at PageID #901; 911).  Prior to its distribution, King shared the Anonymous Memo with Officer Kolenc, but not with Detective Hill; instead, he told Detective Hill that "guys were talking about this, and it was likely going to happen."  (*Id.* at PageID #902–03).  Thereafter, King circulated the Anonymous Memo and a "Survey Monkey" poll to 24 officers, seeking a vote of no-confidence in Chief Lichman, with the goal of removing Chief Lichman from his position.  (*Id.* at PageID #911–12; 915; ECF 16-1, Pl. Ex. 4, PageID #240).  Of those who received the poll, 18 officers voted, and the vote was unanimous; all 18 officers voted that they had no confidence in the leadership of Chief Lichman.  (ECF No. 19, PageID #913).  The OPBA then informed the City of the no-confidence vote and provided the mayor with a copy of the Anonymous Memo.  (*Id.* at PageID #917).

In addition to the "concerns" King testified about, the Anonymous Memo also referenced two "retweets" from Chief Lichman's "30 Year Itch" Twitter account.  (*Id.* at PageID #975).  The first concerns Chief Lichman's alleged "porn habits."  (*Id.*).  Chief Lichman testified that he "retweeted" an article at least ten years ago about the National Security Agency spying on "porn habits to discredit radicalizers."  (*Id.* at PageID #976).  In the "retweet," Chief Lichman joked,

"count me out of any radicalizing." (*Id.*).  The Anonymous Memo apparently missed the joke. (*Id.*; *see* ECF No. 16-1, PageID #227).

The Anonymous Memo contained a screenshot of another "retweet" and accused Chief Lichman of "cybering."[4]  (ECF No. 16-1, PageID #228).  Chief Lichman testified that he was responding to a tweet from author Margot Wood, though he does not recall the subject of her tweet. ECF No. 19, PageID #976).  The "retweet" states, "Cybering.  Good times . . . err . . . if I did that type of thing."  (ECF No. 16-1, PageID #228).

Chief Lichman responded to the Anonymous Memo in a March 1, 2023 memorandum to the mayor, responding in substance to each accusation and denying any wrongdoing.  (*Id.* at PageID #979; Def. Ex. 4, P. 1).  He claimed that the social media posts were anywhere between four and ten years old, and all predated his promotion to chief.  (Ex. 4, P. 2; ECF No. 19, PageID #973–77).  Regarding the nude photo, Chief Lichman testified at the hearing that the photo appeared on his private Instagram account for "20 or 30 minutes, when a friend notified me of the reflection and immediately it was taken down."  (ECF No. 19, PageID #977–78; Def. Ex. 11, P. 1–2).

He stated that he had approval from then-Chief Stillman to attend the Black Lives Matter protest, which renders his conduct inactionable under the RRPD Policy Manual.  (Ex. 4, P. 4). Chief Lichman also stated that the Anonymous Memo's concerns about employee hiring were demonstrably false, and that the City may not replace an officer until there is a vacancy; the concerns about the number of dispatchers was a problem he was actively working on; "backchannelling" allegations are false; that he receives many emails each day, often regarding matters that should be handled by supervisors lower in the chain of command, and he tries hard to

---

[4] Chief Lichman testified that he learned the term "cybering" "refers to texting back and forth, things of a sexual nature."  (ECF No. 19, PageID #977).

respond to all emails; the concerns regarding first-aid kits is demonstrably false; and that vehicle repair issues have been ongoing for many years, and Chief Lichman has taken numerous steps to correct those issues.  (Ex. 4, P. 1–14; ECF No. 19, PageID #980–82).  He testified that there is a national shortage of police officers, and that most area police departments are hiring; King could secure another job at any of these police departments if he were terminated.  (*Id.* at PageID #983).

### B.  The September 22, 2023 Investigative Report

The City eventually hired Attorney Aretta Bernard to conduct an investigation into the allegations contained in the Anonymous Memo.  (*Id.* at PageID #920).  Ms. Bernard reviewed the Anonymous Memo; Chief Lichman's response to the Anonymous Memo; the RRPD Policy Manual; correspondence documenting the delivery of the Anonymous Memo and events preceding her retention; Chief Lichman's personnel file; the City's Employee Handbook; the OPBA Officer Collective Bargaining Agreement 2022–24; the OPBA Patrolman Collective Bargaining Agreement 2022–24; RRPD's Draft Strategic Plan; and documents verifying dates of Chief Lichman's social media posts.  (ECF No. 16-1, Pl. Ex. 8, PageID #252–53).  Ms. Bernard also interviewed, Chief Lichman, Kelly Stillman, former Chief of Police, and Julie Morron, operations manager for the RRPD.  (*Id.* at PageID #253; ECF No. 19, PageID #906).  Despite two emails to OPBA General Counsel, Ms. Bernard was unable to obtain the identity of the Anonymous Memo's author, whom she also wanted to interview.  (ECF No. 16-1, PageID #253).  Of particular note is that Ms. Morron supported Chief Lichman, and accused King of writing the Anonymous Memo after a staff meeting in which King was accused of sitting in his cruiser for extended periods of time (the "AVL Investigation").  (*Id.* at PageID #273)

Based on her investigation, Ms. Bernard concluded the Anonymous Memo was not reliable.  (*Id.* at PageID #280).  She noted that the City took immediate action in response to the

Anonymous Memo: it referred the Anonymous Memo to the Ohio Attorney General's Office and the Cuyahoga County Prosecutor's Office, and referred the matter to Ms. Bernard to investigate Chief Lichman's alleged policy violations.  (*Id.* at PageID #275–76).  Ms. Bernard determined that Chief Lichman did not violate any RRPD policy. (*Id.* at PageID #276–80).  She also found that the Anonymous Memo's references to Chief Lichman's "porn habits" and "cybering" were "both unfairly disparaging and unsupported by the evidence."  (*Id.* at PageID #277).  She determined that the social media posts were not "recently posted," and allegations regarding the nude photo were an attempt to embarrass Chief Lichman.  (*Id.* at PageID #278).  Ms. Bernard concluded that there was credible evidence that refuted claims that Chief Lichman (1) had been unable to hire new officers; (2) deprived officers of first-aid kits; and (3) had not addressed staffing concerns. Finally, she concluded that there was credible evidence to support the belief that the Anonymous Memo was both submitted to distract from the AVL Investigation and correction of performance deficiencies of POs, and to cause Chief Lichman's termination to create a vacancy and need to promote the next eligible candidate to sergeant.  (*Id.* at PageID #280).

### C.  The Wagner and Morron Letters

After the vote of no confidence, King testified that problems with the vehicle fleet persisted, and new problems emerged.  (ECF No. 19, PageID #921).  One such new problem involved Lieutenant David Wagner, who was caught drinking at a bar in Avon while armed.  (*Id.*). The Avon police were called; Lieutenant Wagner informed officers that he had consumed alcohol.[5] (ECF No. 16-1, Pl. Ex. 11, PageID #283).  Officers observed no signs of impairment, but ordered Lieutenant Wagner to leave the bar.  (*Id.*).  Lieutenant Wagner complied.  (*Id.*).  King testified that

---

[5] King testified that Lieutenant Wagner had consumed "four of five beers."  (ECF No. 19, PageID #922).  King did not testify that he was present at the bar, and the police report does not specify how many beers Lieutenant Wagner consumed.

this bothered the bargaining unit, not only because Lieutenant Wagner should have known that what he did was a crime, but because he violated the very procedures he is, in part, tasked with drafting.  (ECF No. 19, PageID #925–26).

King also testified that "there were questions" and rumors about a police report Lieutenant Wagner filed concerning damage caused to his city-owned vehicle, and a lack of transparency as to who would pay for the damage.  (*Id.* at PageID #926).  An undated letter to the mayor, signed by "Police Officers of the City of Rocky River," stated, in part:

> In his report, Lt. Wagner reported that his wife backed into the vehicle while it was parked in his driveway.  The damage is to the left door of the vehicle, which is inconsistent with getting backed into.  Furthermore, to this date, the vehicle has not been repaired.  Has Lt. Wagner filed a claim with his insurance company to cover the repairs of the city vehicle?  City employees are disciplined when they are responsible for damage to city vehicles. While Lt. Wagner should not be disciplined for something his wife allegedly did, his wife/insurance company should be held responsible for damage to city property.

(ECF No. 16-1, Pl. Ex. 10, PageID #282 (the "Wagner Letter")).  King testified that he did not write the Wagner Letter and had no knowledge about it until well after it was given to the mayor. (ECF No. 19, PageID #927).

Another alleged new problem involved Ms. Morron.  (*Id.* at PageID #922–23).  According to King, Ms. Morron watched body camera footage for fun, criticized officers, spread rumors, and was generally seen as an office bully, all of which affected morale.  (*Id.* at PageID #923). Additionally, King testified:

> I was aware there was issues, somebody reporting theft of time with Julie not showing up for work on time, not putting in for requested time off or putting in for requested time off, and then later it would disappear off the schedule.
> That was an ongoing issue, but to the offense, that was not a new issue.  That was a prolonged issue that had been going on since shortly after she started working there.

(*Id.*).  Another undated letter, addressed to the mayor and signed by "Police Officers of the City of Rocky River," accused Ms. Morron of "stealing time from the City."  (ECF No. 16-1, Pl. Ex. 12, PageID #284 (the "Morron Letter")).  The Morron Letter included two photos from the RRPD's Precinct Manager software, which includes a calendar where RRPD employees schedule time off.  (*Id.* at PageID #285–86).  According to the Morron Letter, Ms. Morron's time off can be seen on the schedule one week, and during a later week, that time off is missing from the schedule.  (*Id.*).  Like the Wagner Letter, King testified that he did not write the Morron Letter or know about it until long after it was given to the mayor.  (ECF No. 19, PageID #928).

### D.  Lieutenant Wagner's and Ms. Morron's Human Resources Complaints

On February 23, 2024, the RRPD human resources ("HR") director sent a memorandum to the mayor and law director concerning a meeting he had with Ms. Morron about the Morron Letter.  (Def. Ex. 14, P. 1).  Ms. Morron presented the HR director with documents that prove she did not steal time from the City.  (*Id.*).  Ms. Morron disclosed that King has harassed Ms. Morron in the past regarding her time off and believed that King authored the Morron Letter.  (*Id.*).

Ms. Morron stated that she has previously told supervisors that King was harassing her in retaliation for the September 22, 2023 Investigative Report, in which Ms. Morron supported Chief Lichman.  (*Id.*; *see* ECF No. 19, PageID #967).  Beyond her time off, Ms. Morron claimed that King spoke with dispatchers, existing POs, and new hires in an effort to get more people to "bad mouth" her, refuse to cooperate with her, or ignore her.  (Def. Ex. 14, P. 1).  King also followed new female POs and dispatchers around the station, stating to one dispatcher, "we like you."  (*Id.* at P. 2).  Moreover, Ms. Morron claimed that the whole department knows that King records his conversation at work, which makes Ms. Morron afraid to speak around King for fear of being recorded.  (*Id.*).  Ms. Morron stated that King was unresponsive while on patrol, failing to respond

for hours, and that King's good friend, Sergeant Blazer, has followed suit; Ms. Morron stated that he is being unfair and the accusations in the Morron Letter were affecting her work, her livelihood, and her reputation in the department.  (*Id.*).  Overall, Ms. Morron believed that RRPD employees fear King "because of what he might do if they do not agree with him . . . ."  (*Id.*).

On February 25, 2025, Chief Lichman sent a letter to the mayor and other City officials regarding the Morron Letter and Ms. Morron's complaint.  (Def. Ex. 17, P. 1).  Chief Lichman's letter explained that, although Union employee's time off "is calculated and included in the [Precinct Manager] schedule and payroll application," the same is not true for non-union employees, such as Ms. Morron.  (*Id.*).  Instead, Ms. Morron earns time off by working overtime, which she may then use during the week.  (*Id.* at P. 2).  When she wants to use her time off, she submits a form through Precinct Manager, and that time appears on the schedule; after payroll is complete, the form is replaced with a leave bank adjustment, removing the time off from the schedule, and deducting them from her leave bank.  (*Id.*).  Chief Lichman confirmed that Ms. Morron's time—including the time referenced in the Morron Letter—was accounted for, presenting documents demonstrating the same.  (*Id.* at P. 3; *see* ECF No. 19, PageID #967).  On February 26, 2025, the City's Finance Director confirmed the information in Chief Lichman's letter.  (Def. Ex. 19, P. 1).  Chief Lichman later testified that the Morron Letter's claim against Ms. Morron was a serious allegation to make against a member of the police department.  (ECF No. 19, PageID #969).

On February 28, 2024, Lieutenant Wagner complained to the HR director about the Wagner Letter.  (Def. Ex. 15, P. 1).  Lieutenant Wagner stated that the RRPD has a video of the incident (accessible by all officers), which clearly shows his city vehicle parked in the street and a car backing into the driver's side door.  (*Id.*).  The Wagner Letter also states that his wife hit the

city vehicle, which the incident report did not disclose.  (*Id.*).  This information was easily

obtainable by the Wagner Letter's author; Lieutenant Wagner's conclusion was that the author was

"smearing him as a liar."  (*Id.*).  Lieutenant Wagner stated that Chief Lichman must decide how to

handle the repair.  (*Id.*).  The Incident Report states that "Katherine F. Willis backed out of the

driveway at [address] and struck [city vehicle] (6581) which was parked in the street. . . . Video of

incident placed into property under PT# 15035."  (Def. Ex. 16, P. 4).

On February 25, 2024, Chief Lichman sent a letter to the mayor and other city officials

regarding the Wagner Letter.  (Def. Ex. 18, P. 1).  Chief Lichman summarized the incident report

and stated that Lieutenant Wagner complied with RRPD policy regarding reporting damage to city

vehicles.  (*Id.* at P. 2; *see* ECF No. 19, PageID #968).  Chief Lichman also stated that the Wagner

Letter's claim regarding the location of the city vehicle when the damage occurred is inaccurate

and misleading.  (*Id.*).  Since the city vehicle was more than 10 years old with high mileage, Chief

Lichman stated that he decided not to initiate a repair.  (Def. Ex. 18, P. 2; *see* ECF No. 19, PageID

#970).  At the hearing, Chief Lichman testified that he understood Lieutenant Wagner's complaint

against King as one for making false and misleading statements.  (ECF No. 19, PageID #968).

### E.  King's Suspension and the May 30, 2025 Investigative Report

On February 25, 2024, Chief Lichman emailed King to inform him that he was being placed

on paid administrative leave due to a February 23, 2024 HR complaint filed against him.  (ECF

No. 16-1, Pl. Ex. 13, PageID #287-88).  Chief Lichman accused King of violating numerous RRPD

policies, including policies prohibiting harassment, discrimination, oppression, and favoritism;

making false, misleading, or malicious statements targeting one's reputation, authority, or

standing; making disparaging remarks that disrupt the efficiency, good order, and discipline of the

department, or discredit its members; conduct unbecoming of a member of the department; and

11

retaliation.  (*Id.*).  Chief Lichman emailed King another letter on March 12, 2024, informing him that two complaints had been filed against him—one of February 23, 2024, and another on February 27, 2024—and accusing him of additional but similar policy violations.  (ECF No. 16-1, Pl. Ex. 14, PageID #289–90).  The letters each contain the following command: "While on leave, you shall not have any contact with, nor have anyone contact on your behalf, any employee of the City, including members of the Police Division, except authorized union representatives."  (*Id.* at PageID #288; 290; *see id.* at PageID #932)

The City again hired Ms. Bernard to investigate Ms. Morron and Lieutenant Wagner's complaints.  (ECF No. 16-3, PageID #295).  Ms. Bernard reviewed the Wagner and Morron Letters; the relevant RRPD policies; the HR director's memoranda regarding Ms. Morron and Lieutenant Wagner's complaints; Lieutenant Wagner's written response to the Wagner letter; Ms. Morron's personnel file; Chief Lichman's letters to King placing him on paid administrative leave; Chief Lichman's letters to the mayor and City officials regarding his investigation into the Wagner and Morron Letters; the police report and incident video related to Lieutenant Wagner's city vehicle; the OPBA Officer Collective Bargaining Agreement 2022–24; and the OPBA Patrolman Collective Bargaining Agreement 2022–24.  (*Id.* at PageID #295–96).  Ms. Bernard interviewed Ms. Morron, Lieutenant Wagner, Chief Lichman, King, and 34 additional individuals, including 22 current and former RRPD POs, 3 detectives, 2 lieutenants, 5 staff members, and 3 sergeants.

During her interview, Ms. Morron reiterated the claims made in her HR complaint.  (*Id.* at PageID #317).  She also claimed that an incident during which King chastised Ms. Morron over the "all cities" radio channel occurred shortly after the September 22, 2023 Investigative Report.  (*Id.* at PageID #317–18).  She stated that the officer involved in the incident with Lieutenant Wagner in the bar with his firearm was King's good friend, and that the incident was reported to

the media for the sole purpose of embarrassing Lieutenant Wagner. (*Id.* at PageID #318). She told Ms. Bernard that King and two other officers questioned Ms. Morron's time in the past and kept notebooks in which they recorded information about RRPD employees. (*Id.* at PageID #319). Following the September 22, 2023 Investigative Report, Ms. Morron told Chief Lichman that she was concerned about retaliation for supporting him. (*Id.*). Ms. Morron believes King wrote the Morron Letter. (*Id.* at PageID #320).

Chief Lichman told Ms. Bernard about his investigations into the Morron and Wagner Letters and reiterated the results of those investigations. (*Id.* at PageID #321). He stated that the Morron and Wagner Letters contain knowingly false allegations, and he believes that King wrote them both. (*Id.* at PageID #323–24).

During Lieutenant Wagner's interview, he stated that he stumbled across body camera footage in which King, PO Kolenc, and an unknown firefighter discuss City officials and policy. (*Id.* at PageID #329). In the footage, King states, "the mayor 'is like a cunt wife. Do you want a happy wife, be a pussy, or do you want to be a man?'" (*Id.*). Lieutenant Wagner accused King of failing to conduct "due diligence to at least try to confirm facts." (*Id.* at PageID #330). He called the Wagner Letter "misleading, devious, and malicious." (*Id.* at PageID #331).

There are several other interviews of note. In Detective Asbury's interview, he told Ms. Bernard that there were two versions of the Anonymous Memo; the first draft accused Detective Asbury of taking impounded vehicles and using them in his personal training business. (*Id.* at PageID #326). Detective Asbury tried to talk to King and give him proof that the allegation about his business was false; according to Detective Asbury, King refused to review them because he already knew that the allegation was false. (*Id.* at PageID #328). After King unsuccessfully lobbied to be promoted to sergeant and assigned to the detective bureau, Asbury met with King

about the Anonymous Memo.  (*Id.* at PageID #327).  During this meeting, King asked Detective Asbury "what he wanted, and Detective Asbury told PO King he wanted those allegations removed if this document was going to be provided to the city." (*Id.*).  King removed the language before facilitating the delivery of the Anonymous Memo to the city.  (*Id.* at PageID #328).  Detective Asbury claimed that King was a "habitual complainer," that the Anonymous Memo "crossed the line," and "100% a personal attack on the Chief and goes well beyond what should be a basic respect for whoever holds the position of Chief." (*Id.*).

Dispatcher Kathi Nowicki told Ms. Bernard that King mentioned Ms. Morron's time off in the past and believes that King has not liked Ms. Morron since she was hired.  (*Id.* at PageID #332). Ms. Nowicki also told Ms. Bernard that she has heard King refer to Ms. Morron as a "cunt," and that she has not heard King refer to a male as such.  (*Id.* at PageID #333).  Dispatcher Katie Crea told Ms. Bernard that she overheard King tell another PO that "a meeting hadn't gone well with the Union, and he was going to go after the mayor and Wagner instead."  (*Id.* at PageID #334–35). Ms. Crea stated that she, too, has heard King call Ms. Morron a "cunt," but has never heard King refer to a male as such.  (*Id.* at PageID #336).  Ms. Crea was offended by King's use of the word "cunt." (*Id.*; *id.* at PageID #338).  Ms. Morron has not heard King use the word "cunt" in relation to her.  (*Id.* at PageID #450).  Ms. Crea has never heard anyone besides King complaint about Ms. Morron's time off.  (*Id.* at PageID #337).  She believes that King wrote the Wagner and Morron Letters because they are written in the same style in which King speaks, and because he has disparaged Wagner in conversations with her.  (*Id.*).  Ms. Crea also told Ms. Bernarnd that she has heard King refer to Chief Lichman as a "fag."  (*Id.* at PageID #338).

Officer Kolenc told Ms. Bernard that King "butts heads with pretty much everybody…." (*Id.* at PageID # 341).  He also denounced the personal attacks on Chief Lichman contained in the

Anonymous Memo.  (*Id.* at PageID #345).  Sergeant Blazer stated that the Morron Letter was consistent with a comment King made at roll call, during which he stated that Lieutenant Flowers was investigating Ms. Morron's dishonesty about her time off.  (*Id.* at PageID #348–49). Lieutenant Flowers informed Ms. Bernard that he did no such thing, and did not know what prompted King to say that.  (*Id.* at PageID #360; 362–63).

Detective Craig Witalis told Ms. Bernard that, on March 9, 2024, King texted him asking for a phone call.  (*Id.* at PageID #380).  King told him:

> [A]ll of the stuff that is going on right now has nothing to do with him.  PO King then went on to explain how it had to do with Ms. Morron taking time off and stated that the issue had come up years ago regarding her taking too much sick time, vacation time and stuff.  Det. Witalis further said that PO King told him during this call that another patrol officer had brought the issue of [Ms. Morron's] time up earlier in the day and he suspected that it might be that patrol officer.

(*Id.*).  Detective Witalis gave Ms. Bernard a copy of the text and the call log showing that he spoke to King for one hour and ten minutes.  (*Id.*; Def. Ex. 21).  Detective Witalis identified that other officer as Lieutenant Flowers.  (ECF No. 16-3, PageID #380).  As for what King claimed he had nothing to do with, Detective Witalis stated that it was regarding his placement on administrative leave.  (*Id.* at PageID #381).

When Sergeant Stephanie Troha scored higher than King on a sergeant promotional exam, King tried to have the test results thrown out by accusing Sergeant Troha of lying and cheating. (*Id.* at PageID #397–98).  Sergeant Troha told Ms. Bernard that King made her uncomfortable during the year they patrolled together because King often disparaged his wife in ways that shocked her.  (*Id.* at PageID #398).  She also claimed that King pressured the officers to vote "no" during the vote of no confidence.  (*Id.* at PageID #399).

Regarding the Wagner and Morron Letters, every officer interviewed by Ms. Bernard stated that they did not know about the letters.  (ECF No. 19, PageID #991).  Most also stated that they did not authorize anyone to write them on their behalf, nor told them that the letters would be sent on their behalf.  (*see generally* ECF No. 16-3).  The officers also told Ms. Bernard that, if they had concerns about Ms. Morron's time off, they would have gone through the chain of command to report it.  (ECF No. 19, PageID #991).

As part of her investigation, Ms. Bernard interviewed King under oath.  (ECF No. 16-3, PageID #428).  King testified that he had not contacted any member of the RRPD during his paid administrative leave, and specifically denied texting and speaking with Detective Witalis on March 9, 2024.  (*Id.*).  At the hearing, King admitted that he spoke to Detective Witalis while on leave, but denied speaking to him about the investigation.  (ECF No. 19, PageID #957).  When presented with the text message he sent Detective Witalis, King testified that he had not seen this evidence before and did not recall sending the text.  (*Id.* at PageID #958).  He admitted that he violated Chief Lichman's directive not to interact with members of the department during the investigation.  (*Id.*).  Chief Lichman testified that King's conversation with Detective Witalis both violated his directive to King and amounted to insubordination.  (*Id.* at PageID #972).

King claimed that his grievance relating to the sergeant exam was made on behalf of the union, but did not recall the officers who complained about the test's lack of security measures.  (ECF No. 16-1, PageID #430).  When asked whether he has ever referred to a female RRPD employee as a "cunt," King stated, "I don't use that language.  I don't recall a conversation where I would have said that.  That's not typical in my vernacular."  (*Id.* at PageID #431).  He explicitly denied calling the mayor a "wife cunt" or "cunt wife."  (*Id.*).  He also denied calling Chief Lichman

a "fag," though others in the department (whose identities King could not recall) have said it.  (*Id.* at PageID #432).

When King testified at the hearing, he admitted to using the phrase "cunt wife" in reference to the mayor, and the footage capturing his use of the word was played into evidence.  (ECF No. 19, PageID #934; 938; Def. Ex. 26).  He claimed he didn't recall using that word, and that it was a year and a half prior to his interview with Ms. Bernard.  (ECF No. 19, PageID #935).  He also testified that no one had alerted him to the existence of the tape before his interview with Ms. Bernard and that seeing the video refreshed his memory of the discussion.  (*Id.*; *id.* at PageID #955).  On cross, defense counsel presented King with a text message in which he referred to Detective Hill as a "cunt;" King acknowledged that the word appeared in the text messages, but did not recall to whom it referenced.  (ECF No. 19, PageID #941–42; Def. Ex. 27).

King admitted that he did not vet every single piece of information included in the Anonymous Memo to determine its accuracy.  (ECF No. 16-1, PageID #433).  King could not recall where he obtained the information about Chief Lichman's "porn habits" or "cybering."  (*Id.* at PageID #434).  He also could not recall who, if anyone, contributed to the Anonymous Memo's personal attacks on Chief Lichman.  (*Id.*).  King denied calling Ms. Morron a cunt, and claimed he was not upset about her participation in the September 22, 2023 Investigative Report.  (*Id.* at PageID #435).  He could not recall the AVL Investigation, during which he was accused of sitting idle when he was supposed to be patrolling.  (*Id.*).  King did not investigate any of the claims in the Anonymous Memo.  (*Id.* at PageID #436).  King denied participation in removing the language about Detective Asbury from the Anonymous Memo.  (*Id.* at PageID #437).  He denied wanting a promotion to sergeant.  (*Id.*).  He had no facts to support the claim that someone was not accounting for their time properly in Precinct Manager.  (*Id.*).

King denied writing, mailing, or having ever seen, the Wagner and Morron Letters.  (*Id.* at PageID #439).  He denied that someone sent them on his behalf.  (*Id.*).  He stated that he believed that Lieutenant Flowers wrote the Wagner and Morron Letters, or at least knows who wrote them.  (*Id.*).  King denied gathering information in support of the Wagner and Morron Letters, and denied taking the Precinct Manager screen shots.  (*Id.* at PageID #440).  King repeated this testimony at the hearing.  (ECF No. 19, PageID #924; 927; 931).

Ms. Bernard reviewed the facts she obtained through her investigation in light of existing law relating to the dishonesty of a police officer, hostile work environments and harassment, and retaliation.  (ECF No. 16-1, PageID #450–54).  She concluded that "[t]here is credible evidence that PO King had involvement in the [Wagner and Morron Letters]."  (*Id.* at PageID #455).  She states that King's Complaint in this case admits that King "brought forth the issues anonymously raised in the [Wagner and Morron Letters] that make false statements of fact regarding Ms. Morron and Lt. Wagner."  (*Id.*).  The other police officers in the RRPD "credibly denied any knowledge of, or participation in, or consent to the preparation and mailing of" the Wagner and Morron Letters.  (*Id.* at PageID #456).

Regarding the Wagner and Morron Letters, Ms. Bernard concluded that their author sent them "without any internal attempt to verify the content or report the issues, if valid, through the chain of command," and did not prepare them on behalf of the Union.  (*Id.*).  The Morron Letter "contains a false statement of theft that is harmful to the reputation of the target of the letter," and the author either knew the statement was false or recklessly disregarded the falsity.  (*Id.*).  The Wagner Letter "contains a false statement questioning the credibility of Lt. Wagner that is harmful to the credibility/reputation of the target of the letter."  (*Id.*).  The Wagner Letter's author either knew the statements therein were false or recklessly disregarded the falsity.  (*Id.* at PageID #457).

18

Ms. Bernard concluded that, based on Ms. Morron's complaint, King was appropriately placed on administrative leave.  (*Id.*).  She also concluded that "King falsely stated during his sworn interview that he has not had contact with any member of the department."  (*Id.*).  It is also not credible that "King would have no recollection of texting Detective Witalis and speaking with him for over an hour and ten minutes."  (*Id.*).  Further, King stated falsely under oath that he never called any female employee of the City a "cunt;" "There is direct evidence captured on video of PO King in uniform in his cruiser where PO King likens/compares Mayor Bobst to a "cunt wife." (*Id.* at PageID #458–59).  There is also credible evidence from two witnesses who heard King call Ms. Morron a "cunt" at work.  (*Id.* at PageID #459).  Moreover, "the word 'cunt' has been legally recognized as a gender epithet that can support a claim for hostile work environment harassment." (*Id.*).  There is also "credible evidence that PO King referred to the Chief as a 'fag' in the workplace."  (*Id.*).  King admitted that he typed the Anonymous Memo; the Anonymous Memo is stylistically similar to the Wagner and Morron Letters, and both the Anonymous Memo and the Wagner and Morron Letters address Ms. Morron's alleged failure to account for time and Wagner's City vehicle incident.  (*Id.* at PageID #460).

Ms. Bernard went on to state that there is credible evidence that King stated his intentions to "go after" the mayor and Lieutenant Wagner; that he made this statement after the publication of the September 22, 2023 Investigative Report; that the initial claims about Detective Asbury were knowingly false when made; his testimony denying involvement in having the language removed from the Anonymous Memo was false; and that King is vindictive.  (*Id.* at PageID #460–61).

At the end of her report, Ms. Bernard states that King's dishonesty violates his oath of office; his use of the words "cunt" and "fag" at work violate RRPD's anti-harassment policy

regarding gender and sexual orientation, which requires termination; that King violated at least 13 additional RRPD policies; and that there is credible evidence to support that King retaliated against Ms. Morron following the September 22, 2023 Investigative Report.  (*Id.* at PageID #462–63). These violations of both the law and RRPD policy warrant "discipline, inclusive of termination . . . based on PO King's established, numerous instances of misconduct."  (*Id.* at PageID #463).

### F.  The Upcoming *Loudermill* Hearing

Following the May 30, 2025 Investigative Report, Chief Lichman emailed King a letter dated June 16, 2025, notifying him of a pre-disciplinary *Loudermill* hearing set for July 17, 2025 before Safety-Service Director Rich Snyder.  (ECF No. 16-6, PageID #468–71).  The letter informs King of each of the policy violations Chief Lichman believes King committed.  (*Id.*).  Those violations include:

- "conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, gender, ancestry, citizenship, sexual preferences, marital status, national origin, age, or disability" for the "purpose or effect of creating an intimidating, hostile, or offensive work environment" or "unreasonably interfering with an individual's work performance" or employment opportunities;

- sexual harassment;

- discrimination;

- retaliation;

- failure to follow lawful orders;

- violating an RRPD policy;

- disobeying a direct order;

- "giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department-related business;

- making disparaging remarks that disrupted the efficiency of the department;

- "discourteous, disrespectful or discriminatory treatment of any member or the public or any member of the department or the City;"

- "use of obscene, indecent, profane, or derogatory language while on-duty or in uniform;" and

- "criminal, dishonest, or disgraceful conduct . . . that adversely affects the member's relationship with" the RRPD."

(*Id.*).  The hearing notice also informed King of his right to representation, to present witnesses and evidence "to refute, explain, or otherwise defend yourself against the allegations made against you."  (*Id.* at PageID #471).

The union requested, and Chief Lichman agreed, to move the *Loudermill* hearing to July 31, 2025.  (ECF No. 19, PageID #960).  King filed his Motion for Preliminary Injunction just three days before the *Loudermill* hearing.  (*Id.*).  King testified that he did not file it sooner because the motion "needed time to be prepared."  (*Id.* at PageID #961).  He did not request any temporary restraining order at any time prior to the filing of his motion.  (*Id.*).

Chief Lichman clarified that the discipline King is facing is unrelated to his First Amendment rights.  (*Id.*at PageID #987).  The City has not yet decided whether it will terminate King.  (*Id.* at PageID #984).  King also acknowledged at the hearing that, if he were terminated in relation to the Wagner and Morron Letters, he could file a grievance under the union contract.  (*Id.* at PageID #959).  If that grievance were unsuccessful, King also acknowledged that he could

initiate an arbitration to determine whether his termination was for just cause.  (*Id.* at PageID #960).

## II.    MOTION STANDARD

A preliminary injunction is an extraordinary remedy that is only appropriate where a movant is threatened with irreparable harm.  *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978) (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974)).  By preventing that harm and preserving the status quo between the parties, a preliminary injunction protects the court's ability to decide the case on its merits.  *Id.*

Courts decide whether to take this extraordinary measure by considering four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction."  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).  While no one factor carries controlling weight, *Michigan State v. Miller,* 103 F.3d 1240, 1249 (6th Cir. 1997), the first—whether the movant is likely to succeed on the merits—is generally considered the most important of the four.  *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024).  If the movant is unlikely to succeed on their claim anyway, the court will not bother enjoining the opposing party.  *Id.*  Similarly, the second factor—whether the movant would suffer irreparable injury—is typically an indispensable requirement.  *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023).  The core purpose of a preliminary injunction is to guard against imminent irreparable harm, so any plaintiff that seeks one *must* demonstrate that, without it, they are likely to suffer an immediate injury that is not remediable at final judgment.  *Id.*

In the case of an alleged constitutional violation, a preliminary injunction is only proper if Plaintiff is likely to succeed on the merits of his First Amendment retaliation claim.  *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022).  The Court addresses both King's likelihood of success on the merits and whether he will imminently suffer an irreparable injury.

### III.    DISCUSSION

#### A.  King is unlikely to succeed on the merits of his First Amendment claim.

A party succeeds on a First Amendment retaliation claim if they can prove three elements: (1) they engaged in protected conduct; (2) they suffered an adverse action "that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two."  *Coleman v. Kent*, No. 24-1737, 2025 U.S. App. LEXIS 15984, at *7 (6th Cir. June 26, 2025) (cleaned up).

The first element, protected conduct, warrants extensive scrutiny in the instant case, because Plaintiff is a public employee.  A public employee's speech only qualifies for First Amendment protection if it satisfies a three-prong test: the speech must (1) be that of a private citizen; (2) address a matter of public concern; and (3) satisfy the *Pickering* test by outweighing the government's managerial interests.  *Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 381 (6th Cir. 2024).

"First, the employee must have spoken as a private citizen, not pursuant to his official duties."  *Id.*  This Court has taken this to include speech that owes its existence to *any* of a public employee's responsibilities, be they official or unofficial.  *See Laurie v. Walder*, No. 21-cv-01112, 2021 U.S. Dist. LEXIS 231421, *7 (N.D. Ohio Dec. 3, 2021) ("[P]ublic employees do not speak as private citizens when they speak 'pursuant to their official duties,' including their 'ad hoc or de facto duties.'") (quoting *Mayhew v. Town of Smyrna*, 856 F.3d 456, 465 (6th Cir. 2017)).  There is

an exception, however, for speech uttered by a public employee in his role as a union representative; a police officer's statements in his role as union representative "are spoken as a private citizen, rather than pursuant to the officer's official duties." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013); *see Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) ("[S]peech in connection with union activities is speech 'as a citizen' for the purpose of the First Amendment.").

"Second, the speech must address a matter of public concern." *Noble*, 112 F. 4th at 381.  In this context, a public concern is "any matter of political, social, or other concern to the community." *Seals v. Wayne Cnty.*, No. 24-1098, 2025 U.S. App. LEXIS 4624, at *6 (6th Cir. Feb. 25, 2025).  A court determines whether speech addresses such matters by considering the "content, form, and context of a given statement, as revealed by the whole record." *Noble*, 112 F.4th at 381 (internal citations omitted).  When speech touches on both public *and* private concerns, the court makes the call based on which concerns comprise the speech's "primary focus." *Seals*, 2025 U.S. App. LEXIS 4624, at *6 (internal citations omitted).

When it is certain that the public employee spoke as a private citizen on a matter of public concern, the court engages in what is known as the *Pickering* balancing test.  To be protected, "the employee's interests in speaking on matters of public concern must outweigh the state's interest, 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Noble*, 112 F.4th at 381 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  The counterweight to public sector free speech concerns is the government's ability to maintain order and prevent disruption in the workplace; this test is meant to strike a fair, necessary balance between the two. *Seals*, 2025 U.S. App. LEXIS 4624, at *7. To perform the *Pickering* test, courts consider "whether the statement impairs discipline by superiors or harmony

among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012) (internal citations omitted).

### a. King's proposed discipline is unrelated to the Anonymous Memo.

When a public employee alleges that the government retaliated against him for his speech, he must show that the "speech was a substantial or motivating factor of" a harmful action. *Lemaster v. Lawrence Cnty., Ky.*, 65 F.4th 302, 309 (6th Cir. 2023) (citing *Anders v. Cuevas*, 984 F.3d 1166, 1177 (6th Cir. 2021)) (internal quotations omitted).  This standard requires less than but-for causation.  *Id.* (citing *Comcast Corp. v. Nat'l Assn. of African Am.-Owned Media*, 589 U.S. 327, 337 (2020)).  A public employee need only make a prima facie showing of retaliation. *Hartman v. Moore*, 547 U.S. 250, 260 (2006).  After that, the government must establish that it would have issued the same discipline even without the alleged impetus to retaliate.  *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.  *Id.*

None of the policy violations concern the Anonymous Memo; Defendants claim that "the City's decision to schedule [King's] *Loudermill* hearing were solely motivated by his harassment and retaliation against Ms. Morron—as determined by an independent investigator."  (ECF No. 17, PageID #473).  King did not claim otherwise in his motion, nor testify otherwise at the hearing. (*see* ECF No. 16, PageID #143–45; ECF No. 19). Instead, King argues that Chief Lichman's statements during the investigation into the Anonymous Memo could potentially chill speech.

(ECF No. 16, PageID #143–44).  King does not plead a defamation claim, nor any damages associated with the potential that Chief Lichman's statements could chill speech.  (ECF No. 1).  The Anonymous Memo therefore cannot support King's claim for retaliation based on First-Amendment speech.  The Court therefore declines to review the Anonymous Memo against the *Pickering* test.

### b. If King wrote the Morron and Wagner Letters, he did so as a public employee.

When and employer demotes or terminates an employee for speech that the First Amendment protects, the employee may challenge the employer's action under the First Amendment and 42 U.S.C. § 1983, even when the employee claims he did not utter the speech in question.  *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 273 (2016).[6]  In that circumstance, however, if the employer "(1) had reasonably believed that the employee's conversation had involved personal matters, not matters of public concern, and (2) had dismissed the employee because of that mistaken belief," the dismissal does not violate the First Amendment.  *Id.* at 272 (citing *Waters v. Churchill*, 511 U.S. 661, 679–80 (1994)).  "In a word, it was the employer's motive, and in particular the facts as the employer reasonably understood them," that matters.  *Id.*

Here, the May 30, 2025 Investigative Report concluded that King wrote the Morron and Wagner Letters and did not prepare them "on behalf of the Patrol Unit or connected to any union activity."  (ECF No. 16-3, PageID #456).  Chief Lichman's letter notifying King of the *Loudermill* hearing included a copy of this report; there is no question that Chief Lichman issued the hearing notice and list of violations after receiving this report.  (ECF No. 19, PageID #986).  Defendants thus appear to believe that King wrote the Morron and Wagner Letters, not as a representative of

---

[6] This resolves the Court's concerns regarding King's standing to assert a First Amendment claim for speech he claims he did not make.

the Union, but as a private citizen (ECF No. 16-6, PageID #468); the Court sees no reason in law or policy that *Waters* should not extend to the private-citizen requirement.  This belief, however mistaken it may be, is reasonable, and if Defendants terminate King because of that belief, they will not violate King's First Amendment rights.  King has not taken credit for the Morron and Wagner Letters, and has not argued or testified that *if he did* write them, he wrote them as a union representative.  Therefore, the evidence shows that King wrote the Morron and Wagner Letters as a public employee, depriving him of First Amendment protection for the letters.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Even if the Court were to disregard *Heffernan* and *Waters*, the Court's conclusion would be the same.  When deciding whether a public employee's speech was made as an employee or private citizen, courts consider several factors.  Common inquiries include (1) the motivation behind the speech; (2) the speech's setting; (3) the speech's audience; and (4) its general subject matter.  *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021); *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017).

Applying the "motivating factor" test described above, King did not make a prima facie showing of retaliation for constitutionally protected speech.  First, neither King's motion nor his testimony alleged that he is suffering retaliation for protected speech contained in the Morron and Wagner Letters.  Second, the only parties to speak about any potential retaliation claim related to the Morron and Wagner Letters were Defendants: "the City's decision to schedule [King's] *Loudermill* hearing were solely motivated by his harassment and retaliation against Ms. Morron— as determined by an independent investigator."  (ECF No. 17, PageID #473).  To the extent that King's impending discipline is based on the overwhelming, independently-gathered evidence contained in the May 30, 2023 Investigative Report, any discipline King receives will be based not

on retaliation, but on that independently-gathered evidence.  King does not argue that the entire RRPD and Ms. Bernard engaged in a conspiracy to achieve his termination; the May 30, 2025 Investigative Report is thorough and believable, and establishes several independent bases to discipline King.  These include speaking to Detective Witalis while on leave in direct violation of Chief Lichman's command and his repeated use of the word "cunt" to describe women, including the mayor and Ms. Morron.  These allegations have nothing to do with the Morron and Wagner Letters; they significantly undercut any claimed retaliation.

Regarding the setting in which the employee spoke, "[o]n the clock speech at the employer's place of business is more likely to be speech as a government agent as compared to off-the-clock speech away from the office."  *DeCrane*, 12 F.4th at 586 (citing *Handy-Clay v. City of Memphis*, 695 F.3d 531, 540–42 (6th Cir. 2012).  There is no evidence that King wrote the Morron and Wagner Letters at work or during the workday, but neither party disputes that the speech occurred on City property when someone delivered the letters to the mayor.

As to the speech's audience, "Speech to supervisors is more likely to be speech as a government agent as compared to speech to outside individuals."  *DeCrane*, 12 F.4th at 586.  When an employee's speech is a work-related grievance addressed to a supervisor, the speech is that of a public employee.  *Bushong v. Delaware City Sch. Dist.*, 851 F. App'x 541, 544 (6th Cir. 2021); *see also Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 329 (6th Cir. 2010) (holding that a teacher's complaint about class size was made as a public employee because such speech "owes its existence to" her responsibilities as a special-education teacher).  Here, the Wagner and Morron Letters were directed to the mayor.  (ECF No. 19, PageID #924; 927).  Moreover, both letters' contents "owe [their] existence to" the author's position at the RRPD,

28

without which the author could not have gained the information contained therein.  *See Fox*, 605 F.3d at 329.  This issue likewise goes to the general subject matter of the letters.

The Court concludes that King authored the Morron and Wagner Letters as a public employee.  He cannot receive First Amendment protection for that speech.  King therefore has no likelihood of success in this action.  A preliminary injunction cannot issue under such circumstances.

### B.  King's purported injuries are reparable.

An irreparable injury "must be both certain and immediate," not "speculative or theoretical."  *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (citing *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Griepentrog*, 945 F.2d at 154 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).  No irreparable injury occurs from employment termination when the employee can appeal the employer's decision.  *Sampson*, 415 U.S. at 91.  Even if a plaintiff's pre-termination hearing is procedurally irregular, the appeal process, before an independent arbiter, requires the employer to conform to applicable law.  *Id.*

King says that he is injured because: *if* the City is permitted to hold a *Loudermill* pre-termination hearing, and *if* that hearing results in King's termination, and *if* he is unsuccessful in any subsequent grievance, and *if* he is also unsuccessful at any subsequent arbitration, he will no longer have his job at the Rocky River Police Department.  As one court aptly put it, "there's a lot

of ifs in there."  *D.T.*, 942 F.3d at 327.  "[A]ll those 'ifs' rule out the certain and immediate harm needed for a preliminary injunction."  *Id.* (citing *Griepentrog*, 945 F.2d at 154).

King has three opportunities to demonstrate that he did not engage in the conduct Defendants claim: (1) the *Loudermill* hearing; (2) a grievance; and (3) binding arbitration.  King's ability to appeal the City's decision to terminate him, if it makes such a decision, through two separate appellate procedures means that he will not suffer irreparable injury if terminated. *Sampson*, 415 U.S. at 91.

## IV.    CONCLUSION

In the absence of any likelihood of success on the merits or an irreparable injury, this Court cannot grant King's Motion for Preliminary Injunction.  The motion is, therefore, **DENIED**.

**IT IS SO ORDERED.**

**Dated August 6, 2025**

_____
**CHARLES E. FLEMING**
**U.S. DISTRICT COURT JUDGE**